# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

№ 14-CR-485 (JFB)

---

UNITED STATES OF AMERICA,

versus

MICHAEL SMITH,

Defendant.

---

**MEMORANDUM AND ORDER**
November 16, 2015

---

JOSEPH F. BIANCO, District Judge:

On October 25, 2015, the government filed a Superseding Indictment against defendant Michael Smith ("Defendant" or "the defendant"), an alleged member of the Nine Trey Bloods gang, charging him with one count of conspiracy to distribute controlled substances, 21 U.S.C. § 841(a)(1); one count of felon in possession of ammunition, 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 3551 *et seq.*; one count of use of firearms during a drug trafficking crime, 18 U.S.C. §§ 924(c)(1)(A)(i), 2 and 3551 *et seq.*; one count of conspiracy to assault an individual with dangerous weapons, 18 U.S.C. §§ 1959(a)(6) and 3551 *et seq.*; one count of assault with a dangerous weapon in aid of racketeering, 18 U.S.C. §§ 1959(a)(3), 2 and 3551 *et seq.*; one count of discharging a firearm during crimes of violence, 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(C)(i), 2 and 3551 *et seq.*; and two counts of possession with intent to distribute heroin, 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); 18 U.S.C. §§ 2, and 3551 *et seq*. Specifically, the defendant's charges arise from his alleged involvement in racketeering activity engaged in by the Nine Trey Bloods, including assault and narcotics trafficking between in or about January 2008 and in or about January 2014.

On July 13, 2015, the defendant moved to suppress statements he made to a law enforcement official after his arrest on June 25, 2013, arguing that he was coerced into providing the statements. The defendant also moved to suppress the evidence seized from his home that same day, arguing that the search of the premises was conducted under coercive consent. On August 21, 2015, the government opposed the motion to suppress. The Court conducted an evidentiary hearing regarding the defendant's motion on October 5, 2015. On October 23, 2015, the Court orally denied the motion, and stated that this written opinion, setting forth the Court's reasoning in detail, would follow.

For the reasons set forth below, the motion to suppress is denied. In particular, the defendant argues, *inter alia*, that his post-arrest statements should be suppressed because the statements were the product of coercive police tactics, and the evidence obtained pursuant to a search of his home should be suppressed because consent to search was coerced.

Having conducted a full evidentiary hearing (including an evaluation of the demeanor of the testifying witnesses), the Court finds the version of the events defendant provides in his affidavit to be wholly incredible and, instead, fully credits the version of the arresting and interviewing detectives, as elicited at the hearing. Based on the Court's evaluation of the credible testimony presented by the testifying witnesses and the evidence produced during the suppression hearing, the Court concludes that the defendant's arguments for suppression of his post-arrest statements and the evidence seized from his home are without merit.

First, the Court concludes that none of the defendant's post-arrest statements were made involuntarily; it is clear that the defendant voluntarily confessed to the crimes in question, and that no coercive or improper inducement tactics were employed by the detective that questioned the defendant. In short, the government has met its burden of proving that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights before giving the post-arrest statements. Second, the Court finds that Simone Kelly, the mother of one of the defendant's children and together with the defendant, an occupant of 609 Spur Drive North, knowingly and voluntarily consented to the search of their home. For these reasons, the Court finds that the government has met its burden of proving, by a preponderance of the evidence, that the defendant's post-arrest statements and the evidence obtained from the defendant's home on June 25, 2013, should not be suppressed.

I. FINDINGS OF FACT

The Suffolk County Police Department ("SCPD") detectives who detained and interviewed the defendant on the day of his arrest testified at the suppression hearing. The defense did not call any witnesses.[1] After evaluating the credibility of the witnesses (including their demeanor) and the other evidence offered at the evidentiary hearing, as well as the defendant's affidavit, the Court makes the following findings of fact.

On June 25, 2013, SCPD Detectives, including Detective James Gonzalez, went to 609 Spur Drive North in Bay Shore, New York ("the Residence") to arrest the

---

[1] The defendant submitted an affidavit in which he stated, *inter alia*, that Simone Kelly, with whom the defendant has a child in common and with whom he lived at 609 Spur Drive North in Bay Shore, New York, was told by police that they would seize her vehicle and place their child in foster care if she refused to consent to a search of 609 Spur Drive North. (Def. Aff. ¶ 2.) The defendant further claims that he made statements to the police only because he was coerced and threatened. (*Id.* ¶¶ 3, 4.) Defendant states that officers told him that if he did not admit to possessing the drugs and ammunition, they would arrest Ms. Kelly and place their child in foster care. (*Id.* ¶ 3.) In addition, the defendant challenges the government's contention that he was informed of his rights before making statements to the officers. (*Id.* ¶ 4.) To the extent the defendant's affidavit conflicts with the testimony of the interviewing detectives, the Court finds the defendant's version of events to be not credible in light of the totality of the evidence, including the Court's evaluation of the credibility of the SCPD detectives who testified at the hearing. Instead, having conducted the hearing, the Court finds the detectives' version of events (discussed *infra*) to be fully credible.

2

defendant for his alleged participation in a gang assault. At approximately 2:00 p.m., the officers observed the defendant leave the Residence and enter a red sedan. (Tr. 7:6-8.)[2] The officers approached the vehicle, and arrested the defendant. (*Id.* 8:6-10.) During a search incident to arrest, officers found a clear plastic bag containing heroin in defendant's front pocket. (*Id.* 8:22-24.)

### A. Detective Corbett's First and Second Interviews

The defendant was transported to the Third Precinct and placed in an interview room. (*Id.* 33:11-17.) At approximately 2:30 p.m., Detective Michael Corbett conducted an interview of the defendant. (*Id.*) Detective Corbett testified that the defendant had one hand in handcuffs attached to a chain on the floor and that the defendant's legs were unshackled, which allowed him some freedom of movement. (*Id.* 33:22-34:8.) Detective Corbett advised the defendant of his *Miranda* rights by reading from the "Rules of Interrogation" card, and asked whether the defendant understood and could read English. (*Id.* 34:21-37:3.) Detective Corbett testified that, after the defendant responded that he understood and could read English, he provided the defendant with a copy of the card, which the defendant read. (*Id.* 37:6-25.) Detective Corbett testified that, after reading the card, the defendant said he understood the *Miranda* rights listed. (*Id.* 37:6-10.) He then wrote his initials, and the date and time on the card. (*Id.* 38:11-39:1.) After advising the defendant of his rights and after the defendant agreed to waive those rights, Detective Corbett conducted an approximately twenty minute interview of the defendant. (*Id.* 40:10-14.) During this interview, the defendant told Detective Corbett that he knew he had been arrested for a gang assault; one of his co-defendants had already been arrested for the assault and he had seen the charges and understood the basis for the arrest. (*Id.* 40:7-19; 47:6-12.) Detective Corbett testified that the defendant admitted he was at the scene of the shooting, which occurred on Father's Day in 2013, but said he had not possessed a firearm. (*Id.* 40:24-41:11.) The first interview ended at approximately 2:55 p.m. and Detective Corbett returned approximately thirty minutes later. (*Id.* 41:17-25.)

Detective Corbett resumed the interview at approximately 3:25 p.m. and asked the defendant about the heroin found during the search incident to arrest. Detective Corbett testified that the defendant admitted that the heroin found in his possession at the time of the arrest belonged to him. (*Id.* 42:5-19.) Detective Corbett further testified that the defendant told him that he uses women to sell heroin in order to support his five children. (*Id.* 42:21-44:2.) This interview lasted approximately fifteen minutes, ending at approximately 3:40 p.m. Forty-five minutes later, at approximately 4:25 p.m., Detective Corbett provided the defendant with water, and at around 7:00 p.m., Detective Corbett provided the defendant with coffee and a hamburger. (*Id.* 44:5-19.) Detective Corbett provided the defendant with more water at approximately 9:00 p.m. (*Id.* 44:23-45:4.) The defendant was also given at least one bathroom break. (*Id.* 45:5-7.)

### B. Consent to Search the Residence

At approximately 6:45 p.m., while the defendant was at the precinct, officers,

---

[2] "Tr." refers to citations to the transcript of the evidentiary hearing, and "Ex." refers to exhibits admitted during the suppression hearing.

3

including Detective Rodriguez went to the Residence to ask Simone Kelly for consent to search the Residence. (*Id.* 10:5-11:17.) She agreed and signed a written consent to search form. (*Id.*) Before asking for consent, Detective Gonzalez told Ms. Kelly that the defendant had been arrested for a shooting and explained that they would like to search the Residence for narcotics and weapons. (*Id.* 11:1-5.) Detective Gonzalez testified that Ms. Kelly was calm, responsive, and did not appear to be under the influence of drugs or alcohol. (*Id.* 11:22-12:2.) He also testified that she was never detained or handcuffed. (*Id.* 12:3-6.) During a search of the Residence, Detective Gonzalez testified that officers found ammunition, gun clips, drug paraphernalia, cocaine, and crack cocaine. (*Id.* 15:9-16:4.) The officers at the scene of the Residence informed Detective Corbett about the search and Detective Corbett left the precinct to recover the items found in the Residence. (*Id.* 16:5-6; 46:12-47:2.)

C. Detective Corbett's Third Interview

At approximately 9:50 p.m., Detective Corbett returned to the precinct from the Residence and reentered the interview room, where the defendant remained handcuffed with a single handcuff. (*Id.* 48:9-49:7.) Detective Corbett informed the defendant that a consent search had been conducted at the Residence. (*Id.* 49:19-20.) Before questioning the defendant, Detective Corbett again read the defendant his *Miranda* rights, which the defendant again said he understood

and agreed to waive in writing. (*Id.* 49:21-52:10.) The defendant admitted that the narcotics and ammunition recovered from the Residence belonged to him. (*Id.* 53:21-54:6.) Detective Corbett prepared a written statement, and asked the defendant to place his initials next to each of the *Miranda* warnings on the card confirming he understood his rights and wished to waive those rights. (*Id.* 55:20-60:13.) After reviewing the written statement and making several corrections next to which he placed his initials, the defendant signed the written statement. (*Id.* 60:20-62:18; Ex. 5.)

Detective Corbett testified that throughout all three interviews, both he and the defendant remained calm. Detective Corbett did not yell at or threaten the defendant with physical harm or threaten to arrest his loved ones. (*Id.* 53:5-18.)

II. LEGAL STANDARDS

A. Admissibility of Post-Arrest Statements

To introduce a defendant's custodial statements at trial, the government must show by a preponderance of the evidence that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights against self-incrimination.[3] *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Diallo*, 206 F. App'x 65, 66 (2d Cir. 2006). Thus, the government bears the burden of proving by a preponderance of the evidence both that a defendant was advised of his constitutional rights under *Miranda*

---

[3] In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court determined that "in order to combat [the pressures surrounding in-custody interrogations] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Id.* at 467. Accordingly, "prior to the initiation of questioning," the government must inform a suspect of "the [government's] intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present . . . if [he] so desires.'" *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (quoting *Miranda*, 384 U.S. at 468-70). Once an accused is informed of these rights, he may waive them "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444; *Moran*, 475 U.S. at 421.

4

and that he knowingly, intelligently, and voluntarily waived those rights. *See Lego v. Twomey*, 404 U.S. 477, 482-89 (1972). For a waiver to be voluntary, the waiver must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. In addition, for a defendant to make a knowing and intelligent waiver, he must have "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* However, the accused need not "know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). Instead, the accused need only be aware that "he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.* "Whether a waiver is 'knowing and voluntary' is a question directed to a defendant's state of mind, which can be inferred from his actions and statements." *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993).

Moreover, it is well settled that the actual statements of a defendant are admissible only if they are made voluntarily. *See Dickerson v. United States*, 530 U.S. 428, 433-34 (2000). The statements must be voluntary based on the "totality of the circumstances." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). When a confession is challenged as having been involuntarily made, the burden rests with the government to prove that the defendant's confession was, in fact, voluntary. *See United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010) (citing *Connelly*, 479 U.S. at 168); *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) ("The prosecution bears the burden of demonstrating by a preponderance of the evidence that a confession was voluntary.").

"'A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given.'" *United States v. Williams*, 681 F.3d 35, 45 (2d Cir. 2012) (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d. Cir. 1991)); *accord United States v. Corbett*, 750 F.3d 245, 253 (2d Cir. 2014) ("The question key to voluntariness is whether the subject's 'will was overborne.'" (citation omitted)); *see also United States v. Santiago*, 720 F. Supp. 2d 245, 252 (W.D.N.Y. 2010) ("A statement is not voluntary if it is obtained by any type of physical or psychological coercion or by improper inducement so that a defendant's will was overborne." (citation omitted)). A confession is thus "involuntary" if it is obtained by "'techniques and methods offensive to due process,' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (quoting *Haynes v. Washington*, 373 U.S. 503, 515 (1963)); *see also id.* at 312 (defining actual coercion as "physical violence or other deliberate means calculated to break the suspect's will"). Under the Fifth Amendment, a defendant's involuntary confession is not admissible at trial. *Dickerson*, 530 U.S. at 433.

"[W]hether the confession was obtained by coercion or improper inducement can be determined only by an examination of all of the attendant circumstances." *Haynes*, 373 U.S. at 513-14. "The factors to be considered include the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation." *United States v. Alvarado*, 882 F.2d 645, 649 (2d Cir. 1989) (citation and internal quotation marks omitted)); *see also Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir. 1988) ("In applying the totality of the circumstances test, those factors that a court should consider to determine whether an

5

accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials."). "The relevant characteristics of the individual who confessed are the individual's experience and background, together with the suspect's youth and lack of education or intelligence." *Green*, 850 F.2d at 902. The conditions under which a suspect is questioned include "the place where an interrogation is held, and the length of detention." *Id.* (internal citations omitted). The final factor, the conduct of law enforcement, is of particular importance because "a defendant's mental condition, by itself and apart from its relation to official coercion, should [n]ever dispose of the inquiry into constitutional 'voluntariness.'" *Connelly*, 479 U.S. at 164. However, the determination of whether a defendant's statement was voluntary is highly fact-specific, *see Tankleff v. Senkowski*, 135 F.3d 235, 245 (2d Cir. 1998), and no single criterion controls, *see Nelson*, 121 F.3d at 833. "The overall inquiry into whether a statement was voluntarily given, therefore, is to consider the totality of the circumstances of the interview to determine if the accused's will was somehow overborne by the agent's coercive conduct." *United States v. Yousef*, 925 F. Supp. 1063, 1074 (S.D.N.Y. 1996).

### B. Admissibility of Evidence Seized Pursuant to Consent to Search Defendant's Residence

The Fourth Amendment protects individuals in their homes "against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless search is '*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *United States v. Elliot*, 50 F.3d 180, 185 (2d Cir. 1995) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

"To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable *per se*, one jealously and carefully drawn exception recognizes the validity of searches with the voluntary consent of an individual possessing authority." *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (quotations and citations omitted); *accord United States v. Matlock*, 415 U.S. 164, 169-70 (1974); *Koch v. Town of Brattleboro, Vt.*, 287 F.3d 162, 167 (2d Cir. 2002) ("A search conducted pursuant to consent by an authorized third party does not require probable cause or a warrant." (citing *Matlock*, 415 U.S. at 171 n.7)). Depending on the circumstances, "[t]hat person might be the householder against whom evidence is sought, or a fellow occupant who shares common authority over property . . . ." *Randolph*, 547 U.S. at 109 (citing *Schneckloth*, 412 U.S. at 222 and *Matlock*, 415 U.S. at 170).

When the government "seeks to rely upon consent to justify the lawfulness of a search, [it] has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). The government must prove voluntariness by a preponderance of the evidence. *See id.*; *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006). Whether consent was voluntarily given is "a question of fact to be determined from all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973). The "ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) (citation and internal quotation marks omitted).

6

## III. DISCUSSION

### A. The Defendant's Post-Arrest Statements

The Court finds that, based on the totality of the circumstances, each of the defendant's post-arrest statements was voluntarily given. Moreover, the Court finds that each post-arrest statement was made after a voluntary, knowing, and intelligent waiver of the defendant's *Miranda* rights. In moving to suppress the statements, the defendant argues that the statements were a product of coercion and improper inducement. As discussed in detail below, the government put forth overwhelming evidence indicating that the defendant was not coerced, but rather voluntarily provided his post-arrest statements to SCPD Detective Corbett. Having considered this evidence, as well as the totality of the circumstances surrounding the defendant's proffer of each post-arrest statement, the Court concludes that the government has met its burden as to the defendant's post-arrest statements, and the motion to suppress those statements is, accordingly, denied.

The defendant claims that he was not advised of his rights. The defendant also claims that he was coerced and threatened to admit that the drugs and ammunition found at the Residence belonged to him; he alleges that officers told him they would arrest Ms. Kelly and place their child in foster care if he did not. (Def. Aff. ¶ 3.) In response to the defendant's argument that his statements should be suppressed because coercive tactics were employed to obtain them, the government offered the testimony of Detective Corbett, who testified that he did not threaten the defendant. In light of all of the evidence in the record, the Court finds the defendant's version of events to be not credible and the detectives' version of events to be wholly credible. Thus, having examined all of the circumstances attendant to each statement that was obtained from the defendant, as well as the detectives' version of events that the Court finds to be fully credible, the Court concludes that the government has met its burden of showing that the confessions were obtained voluntarily (and were not the product of coercion or improper inducement), and the motion to suppress on this basis is meritless.

The focus of the defendant's coercion argument is the conduct of Detective Corbett, who took the defendant's post-arrest statements. However, other than the defendant's self-serving affidavit that he was told "that if [he] did not admit that the drugs and ammunition belonged to [him], they would arrest Simone and would place our child in foster care," the record is devoid of any evidence that Detective Corbett coerced the defendant into making inculpatory statements. There is simply no credible evidence in the record that the defendant was forced into providing statements while in custody. Instead, Detective Corbett testified that the defendant was not threatened in any way during the interviews (*see* Tr. 39:18-40:9; 53:7-18; 62:19-63:6.), and the Court finds Detective Corbett to be credible. The government has, therefore, shown that no threatening statements were made and no physical force was exerted at any point during the interviews to pressure the defendant to confess. *See United States v. Awan*, 384 F. App'x 9, 14-15 (2d Cir. 2010) (affirming district court's finding that defendant's statements were voluntary based on, *inter alia*, district court's finding that the government showed that no threatening statements were made during the interviews, and that the government investigators tried to maintain a friendly atmosphere).

7

Moreover, the evidence adduced at the suppression hearing indicates that Detective Corbett did not engage in "repeated and prolonged . . . questioning" designed or intended to overcome the defendant's free will. *Green*, 850 F.2d at 902. There is no evidence that the interviews were anything other than calm, measured question and answer sessions. *See, e.g.*, *United States v. Peldomo*, 10-CR-0069 (RRM)(ALC), 2010 U.S. Dist. LEXIS 129051, at *7 (E.D.N.Y. Dec. 7, 2010). In fact, the defendant was read his *Miranda* rights when he first entered the interview room at the Third Precinct, and he was re-read his rights later that evening. As noted *infra*, the Court finds that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights each time that they were read to him, a fact that is "highly probative" of voluntariness. *United States v. Williams*, 681 F.3d 35, 45 (2d Cir. 2012); *see also Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) (explaining that it is "rare" for a defendant to be able to make a colorable argument that a self-incriminating statement was "compelled" in situations where law enforcement authorities "adhered to the dictates of *Miranda*").

In addition, there is credible evidence that the defendant was taken to the bathroom at least once while he was in custody (*see* Tr. 75:18-22), that he was given the opportunity to eat and drink (*see id.* 44:10-45:4; 75:8-10), and that he was restrained in a way that provided some freedom of movement (*see id.* 33:14-34:8). There was also nothing unusual about the interview room in which the defendant was questioned to suggest that the location itself was somehow inherently coercive. Based on all of these facts, it is clear that the defendant was neither "questioned in a hostile environment nor . . . subjected to rigorous interrogation." *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987).[4]

---

[4] As to the length of defendant's detention, the Court notes, as a threshold matter, that although the defendant remained in the Third Precinct interview room for several hours, the length of each of his individual interviews does not give rise to any presumption of coercion, *see, e.g.*, *Green*, 850 F.2d at 902 (finding duration of interrogation not to be coercive where interview lasted "for just over two hours"); *Guarno*, 819 F.2d at 31 (finding duration of interview not to be coercive when it lasted for approximately two and a half hours), and there is no evidence that the defendant asked for a break and was not granted one. Moreover, there is nothing inherently coercive about the overall duration of the defendant's interrogation. *See, e.g.*, *Jackson v. McKee*, 525 F.3d 430, 434 (6th Cir. 2008) (finding that seventeen-year-old defendant's written confession was voluntarily made when he was subjected to noncontinuous interrogation while in custody for forty hours prior to signing his statement); *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494-95 (9th Cir. 1997) (finding that the petitioner failed to establish that his confession was the product of coercion when "he had been detained since 12:15 a.m. and was not questioned until 9:30 a.m."); *Vance v. Bordenkircher*, 692 F.2d 978, 981-82 (4th Cir. 1982) (finding that fifteen-year-old defendant with moderate mental deficiency confessed voluntarily when he was subjected to intermittent interrogation over a period of approximately nine hours because he was read his *Miranda* rights, was given food, was not threatened or tricked by police officers, and never asked for the questioning to cease); *United States v. Bear Killer*, 534 F.2d 1253, 1256-57 (8th Cir. 1976) (finding in-custody statements to be voluntary when interviews were conducted over a twelve hour period between the defendant's arrest and his confession because, *inter alia*, the defendant was "advised of his rights under Miranda before each interrogation, he was aware of the nature of the offense under investigation, he was denied neither sleep nor food, and the questioning was neither of an oppressive nor a harassing nature"); *United States v. Jacques*, 784 F. Supp. 2d 48, 54 (D. Mass. 2011) (finding the defendant's confession to be voluntary when he was subjected to questioning by law enforcement officers "over a time period lasting more than six-and-one-half hours"). Instead, the length of the defendant's interrogation is but one piece of a much larger "totality of the circumstances" analysis that alone is not dispositive of whether the defendant's statements to Detective Corbett were voluntary. *See, e.g.*, *United States v. Hill*, 2:12cr21-WKW, 2013 U.S. Dist. LEXIS

The Court has also considered, as it must, the relevant characteristics of the defendant – his experience, background, youth, and education or intelligence. *See Green*, 850 F.2d at 902. There is no evidence that the defendant suffers from any sort of mental disability or that he was under the influence of any mind-altering substances at the time of his arrest. Instead, the record before the Court demonstrates that the defendant was responsive and alert throughout the interviews. The Court finds, therefore, that none of the defendant's characteristics support a finding that any of his statements were involuntary made.

Thus, under the "totality of the circumstances" test, the Court concludes that the defendant's statements were neither improperly induced nor obtained by means of physical violence, but, rather, were completely voluntary. Accordingly, the motion to suppress on the basis of improper coercion is denied. *See, e.g.*, *United States v. Rubio*, 709 F.2d 146, 153 (2d Cir. 1983) (affirming district court's denial of motion to suppress based on district judge's findings that, *inter alia*, "there was no credible evidence that [the defendant] was coerced into making any statements through physical or mental abuse" (internal citations and quotation marks omitted)).

\*\*\*

In sum, based on the credible testimony at the suppression hearing and all of the evidence in the record, the Court concludes that none of the defendant's post-arrest statements were involuntarily made or were the product of coercion. The government has met its burden of proving, by a preponderance of the evidence, that each of the defendant's post-arrest statements should be admissible, and the motion to suppress defendant's post-arrest statements is denied.

### B. Evidence Obtained During the June 25, 2013 Search of the Defendant's Home

The defendant argues that the evidence obtained during the June 25, 2013 search of the defendant's home should be suppressed because the search was conducted pursuant to consent by Ms. Kelly obtained through coercion. The defendant argues that the officers threatened Ms. Kelly that they would seize her vehicle and place the defendant and Ms. Kelly's child in foster care if she did not consent to a search of the Residence. The defendant contends that Ms. Kelly's consent to search was, therefore, improperly obtained. For the reasons discussed in detail below, the Court finds that Ms. Kelly's consent to search was offered knowingly and voluntarily, and was not improperly obtained. Accordingly, the defendant's motion to suppress the evidence obtained during the June 25, 2013 search of his residence is denied.

Applying the above-referenced standard to the facts of this case, the Court concludes

---

82467, at *28 (M.D.Ala. Feb. 22, 2013). Notwithstanding the hours the defendant remained in the interview room, as discussed *infra*, there is no indication that the length impacted the voluntariness of the defendant's statements. Instead, based on the evidence adduced at the hearing, the Court finds that the SCPD did not act inappropriately in any manner, and there is no doubt that the defendant was willingly cooperating with Detective Corbett. Moreover, the defendant was given food, drink, and bathroom breaks. In addition, he never indicated or appeared to be tired, nor did he ask that any interview stop because he was tired or for any other reason. In short, there is no evidence that the combined length of the interviews transformed any particular interview into a coercive environment; rather, the evidence demonstrates that the defendant continued to waive his rights and give statements throughout the duration of his interrogation in a knowing, voluntary, and intelligent manner.

that Ms. Kelly voluntarily consented to the search of the Residence. An analysis of the totality of the circumstances makes clear that the consent to search was voluntary.

There is simply no support for the defendant's claim that Ms. Kelly "was told by the police that they would seize her vehicle and place [their] child in foster care if she refused to consent to a search of the house." (Def. Aff. ¶ 2.) The defendant was at the precinct at the time of the search, and has no personal knowledge of the communication between Ms. Kelly and the officers. Detective Rodriguez testified that Ms. Kelly voluntarily provided verbal consent for a search of the Residence, as well as written consent when she signed the Consent to Search form. (Tr. 11:13-17; 12:7-13:19.) Detective Rodriguez testified that Ms. Kelly was not under the influence of any alcohol or drugs, nor was she handcuffed or detained. (*Id.* 11:22-12:6.) Detective Rodriguez testified that he presented the Consent to Search form to Ms. Kelly, and advised her that she did not have to sign it. (*Id.* 11:6-10.) The Consent to Search form explicitly informed her of her right to refuse consent to the search. (*See* Ex. 4.) After receiving all of this information, Ms. Kelly proceeded to sign the Consent to Search form at approximately 6:45 p.m. on June 25, 2013. (*Id.*)

Based on Detective Rodriguez's credible testimony, it is clear that Ms. Kelly was informed of her rights, and waived those rights, prior to providing her verbal and written consent to search. Nonetheless, the defendant contends she was coerced into providing her consent. However, there is simply no evidence in the record to support this conclusory allegation; no evidence was produced during the suppression hearing, nor was any testimony elicited tending to even remotely support this allegation. In fact, Detective Rodriguez credibly denied that any threats were made to induce Ms. Kelly to consent to the search. In short, the evidence presented by the government leads the Court to conclude that Ms. Kelly knowingly and voluntarily consented to the search of the Residence after the true purpose and intent of the form – and the implications of signing that form – were explained to her. Because the Court deems Detective Rodriguez's testimony to be fully credible, and the defendant's version of events to be not credible, and because Ms. Kelly's characteristics do not support a finding of involuntariness, the Court finds that her consent to search was, in fact, knowingly, voluntarily, and intelligently given (and was not the product of coercion or improper inducement).

\*\*\*

For all of these reasons, the Court concludes that the evidence obtained from the defendant's home during the consent search should not be suppressed. Accordingly, the motion to suppress such evidence is denied.

IV. CONCLUSION

For the foregoing reasons, the defendant's motion to suppress is denied in its entirety.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

10

Dated: November 16, 2015
      Central Islip, New York

* * *

The United States is represented by Robert L. Capers, U.S. Attorney, Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201, by Christopher Caffarone and Mark Misorek, Assistant U.S. Attorneys. The defendant is represented by John S. Wallenstein, 1100 Franklin Avenue, Suite 100, Garden City, NY 11530.